The CIIIEE JUSTICE
 

 delivered the opinion.,of the court.
 

 This cause comes before us upon appeal from a decree of the. District Court of the United States for the Southern District of Florida.
 

 The schooner Venice, with a cargo of two hundred ahd
 
 *274
 
 twenty-five bales of cotton, was captured in Lake Pontchartrain by the United States ship-of-war Calhoun, on the -15th of May, 1862; vs as taken to Key West; was libelled as prize of war in the District Court; and was restored with her cargo, to the claimant., David G. Cooke, by its decree. The United States appealed. The claimant, Cooke,, was a British subject, but had resided in New Orleans nearly all the time for ten years preceding the capture. He was a clerk in a large mercantile establishment until June, 1861, when the firm closed its affairs, and he turned his attention to other business, particularly to the collection of planters’ acceptances which he had purchased, and to the investment of their proceeds in cotton. Early in April, 1862, he bought two hundred and five bales in Mississippi; and had them brought to New Orleans, where he purchased the Venice on the 9th of April. Finding that the two hundred and five bales would not fully complete the lading of the schooner, Cooke bought twenty bales more about the 12th of April. The whole was put on board with as little delay as possible, and on the 17th of April, the schooner was towed out into Lake Pontehartráin, and taken to the head of the lake, where she was anchored, and remained, with only such change of position as was necessary to obtain a supply of water, until the capture. In the meantime the vessel was undergoing repairs.
 

 "While these transactions were in progress, the war was flagrant. The States of Louisiana and Mississippi were wholly under rebel dominion, and all the people of each State wore enemies of the United States. The rule which declares that war makes all the citizens or subjects of one belligerent enemies of the Government and of all the citizens or subjects of the other, applies equally to civil and to international wars.
 
 *
 
 Either belligerent may modify or limit its operation as to persons or territory of the other; but in the absence of such modification or restriction.judicial .tribunals cannot discriminate in its application.
 

 
 *275
 
 Tlie vessel and the cotton at the time of purchase belonged to citizens either of Mississippi or Louisiana, and was therefore enemies’ property.
 

 Did the transfer to Cooke change the character in this respect of both or either?
 

 Cooke was a British subject, but was identified with the people of Louisiana by long voluntary residence and by the relations of active business.
 
 *
 
 Upon the breaking out of the war, he might have left the State and withdrawn his means; but he did not think fit to do so'. • He remained more than a year, engaged in commercial transactions. Like many others, he seems to have thought that, as a neutral, he could share the business of the enemies of the nation, and enjoy its profits, without incurring the responsibilities of an enemy. He was mistaken. He chose his relations, and must abide their results. ■ The ship and cargo were as liable to seizure as prize in his ownership, as they would -be in that of any citizen in Louisiana, residing in New Orleans, and not actually engaged in active hostilities against the Union.
 

 This brings us to the consideration of the events which transpired at New Orleans, and in its "vicinity, very soon after the Venice was taken into Lake Pontchartrain.
 

 The fleet of the United States, under command of Flag-officer, now Vice-Admiral, Farragut, reached New Orleans on the 25th of April, and the flag-officer demanded the surrender of the city, and required the authorities to display the flag of the Union from the public buildings. The mayor refused to surrender and refused to raise the National Flag, but declared the city undefended and at the mercy of the victors. The flag-officer then directed the flag to be raised upon the Mint. It was raised accordingly, but was torn down on the same or the next day. The flag of the rebellion still floated over the hall where the city authorities transacted business. On the 29th, the Union flag was raised again, both on the Custom House and Mint, and was not again disturbed. On the 80th, the flag-officer received from the
 
 *276
 
 mayor a note so offensive in its character, that all communication was broken off.
 
 *
 
 The power of the United States to destroy the city was ample and at. hand, but there was no surrender and no actual possession.
 

 The transports conveying the troops -under the command of Major-General Butler, commanding the Department of the Gulf, arrived on the 1st .of May, and the actual occupation of the city was begun.. There was no armed resistance, but abundant manifestations of hostile spirit and temper both by the people and the authorities. The landing of the troops was completed on the. 2d of May, and on the 6th a proclamation of General Butler, which had been prepared and dated on the 1st,, and the next day printed by some soldiers, in an office seized for the purpose, was published in the newspapers of the. city. Some copies of the. proclamation had been previously distributed to individuals, but it was not made known to the population generally until thus published. There was no hostile demonstration, and no disturbance afterwards; and wo think that the military occupation of the city of-New Orleans may be considered as substantially complete from the date of this publication; and that all the rights and obligations resulting from such occupation, or from the ■ terms of .the proclamation, may be properly regarded as -existing, from.that time.
 

 This proclamation declared the city to be under martial law, and announced the principles by which the commanding general would be guided in its administration. Two clauses only have any important relation to the case before us. One is in these words: “ All the rights of property, of whatever kind, Avill 'ba held inviolate,-subject only to the laws of the United States.” The other is thus expressed : “ All foreigners, not naturalized, claiming allegiance to their respective governments, and not having made oath of allegiance to the government of the Confederate States, will be protected in their persons and property as heretofore under the laws of the United States.” These .clauses only reite
 
 *277
 
 rated the rules established by the legislative and executive action of the national Government, in respect to ■ the portions of the States in insurrection, occupied and controlled by the troops of the Union.
 

 The fifth section of the act of July 13th, 1861, providing for the collection of duties and for other purposes, provided that, under certain Conditions, the President, by proclamation, might declare the inhabitants of a State, or any section or part thereof, to be in a state of insurrection against the United States. In pursuance of this act, the President, on the 16th of August following, issued a proclamation declai’-ing that the inhabitants of the States of Virginia, North Carolina, Tennessee, Arkansas, and the other States south of these, except the inhabitants of Virginia west of the Al-leghanies, and of those parts of States maintaining a loyal adhesion to the Union and the Constitution,
 
 “
 
 or from time to time occupied and controlled by forces of the United States, engaged in the dispersion of the insurgents/’ were in a state of insurrection against the United States.
 

 This legislative and executive action related, indeed, mainly to trade and intercourse between the inhabitants of loyal and the'inhabitants of insurgent parts of the country; but, by excepting districts occupied and controlled by national troops' from the general prohibition of trade, it indicated the policy of the Government not to regard such districts as in actual insurrection, or their inhabitants as subject, in most respects, to treatment: as enemies. Military occupation and control, to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient; but substantial, complete, and permanent. Being such, it draws after it the full measure of protection to persons and property consistent with a necessary subjection to military government. It does not, indeed, restore peace, or, in all respects, former relations; but it replaces rebel by national authority, and recognizes, to some extent, the conditions and the responsibilities of national citizenship.
 

 The regulations of trade made under the act of 1861 were framed in accordance with this policy. As far as possible
 
 *278
 
 the people of such pai’ts of the insurgent States as came under national occupation and control, were treated as if their relations to the national Government had never been interrupted.
 

 It is true that- the general exception from the prohibition of commercial intercourse, which has just been mentioned, was cancelled and revoked by the President’s proclamation of the 31st of March, 1863, and, instead of it, a particular exception made of West Virginia, and of the ports of New Orleans, Key West, Port Boyal, and B'eaufort, in North Carolina. But this revocation merely brought all parts of insurgent States under the special licensing power of the President, conferred by the act of July 13,1861. It affected, in no respect, the general principles of protection to rights and property under temporary government, established after the restoration of the national authority.
 

 The same policy may be inferred from the conduct of the war. Wherever the national troops have re-established order under national rule, the rights of persons and of property have been, in general, respected and enforced. When Flag-officer Farragut, in his first letter to the rebel mayor of New Orleans, demanded the surrender of the city, and promised security to persons and property, he expressed the general policy of the Government. So,’ also, when Major-General Butler published his proclamation and repeated the same assurance, and made a distinct pledge to neutrals, he made no declaration which was not fully warranted by that policy. There was no capitulation. Neither the assurance nor the pledge was given as condition of surrender. Both were the manifestation of a general purpose which seeks the re-establishment of the national authority, and the ultimate restoration of States and citizens to their national relations, under better forms and firmer, guaranties, without any views of subjugation by conquest. Hence, the proclamation of the commanding general at New Orleans must not be interpreted by such rules as governed the ease of the
 
 Ships taken at Genoa
 

 *
 

 Vessels and their cargoes belonging to citizens
 
 *279
 
 of New Orleans, or neutrals residing there, and not affected by any attempts to run the blockade, or by any act of hostility against the United States after the publication of the proclamation, must be regarded as protected by its terms.
 

 It results from this reasoning. that the Venice and her cargo, though undoubtedly enemies’ property at the time she was anchored in Lake Pontchartrain, cannot be regarded as remaining such after the 6th of May; for it is not asserted that any breach of blockade was ever thought of by the claimant, or that he was guilty of any actual hostility against the national Government.
 

 It is hardly necessary to add that nothing, in this opinion, touches the liability of persons for crimes or of property to seizure and condemnation under any act of Congress.
 

 Decree affirmed.
 

 [See
 
 supra,
 
 p. 135,
 
 The Circassian;
 
 a case, in some senses, suppletory or complemental to the present one.]
 

 *
 

 Prize Cases "2 Black, 666; concurred in by dissenting Justices, Id 681-8.
 

 *
 

 Prize Oases, 2 Black, 674.
 

 *
 

 Message and Documents, 1862-63, part 3, pp. 282-288.
 

 *
 

 4 .Robinson, 887.