George Andrews, J.,
delivered the opinion of the Court.
*648 The bill in this cause alleges that the complainant is the owner of a tract of land in Hamilton county, and is filed for the purpose of restraining the defendant from entering upon said land, and removing therefrom, a large amount of wood which has been cut upon said land, ánd piled there by certain other parties without authority.
The bill prays for injunction against further inter-meddling with said wood, and for an account of that previously taken.
The answer admits the taking of the wood, and justifies the taking under -a purchase thereof from the military authorities of the United States.
The cause was heard upon bill, answer, and the following stipulation by counsel:
The following facts are admitted in ' this case: The complainant owns the lands mentioned in his bill. Kent & Co., under authority of the United States, without consent of the complainant, went on said land and cut the timber into cord-wood, and sold the same to the military authorities of the United States; then engaged in war with the so-called Confederate States. When the war ended, the United States placed the Nashville and Chattanooga Railroad, back in the hands of its owners, and transferred to them the wood along the line, as shown by the certificate accompanying respondents answer," among which was the wood on the lands of .complainant.
“Respondent entered upon complainants land, and commenced removing it; to enjoin which the ]oill was *649 filed. Tbe defendant had orders from the Federal military authorities to protect them in removing the wood.”
The following is the military order referred to in the above stipulation:
“Military Division of the Tennessee, 129,
“ Quartermaster’s Office XI. S. Military Railroad,
“Nashville, Tenn., Nov. 7th, 1865.
“To WHOM IT MAY CONCERN:
“All wood on the line of the Nashville and Chattanooga Railroad, or ranked in the woods adjacent to that road formerly belonging to the U. S. Military Railroad, having been transferred to the Nashville and Chattanooga Railroad Company, all persons are forbidden to interfere with it except by their permission.
[Signed] “T. J. Gulley,
“Capt. and A. Q. M. U. /?. A., Chief Quartermaster

l<U. S. M. JR. R., 31. D. T.”

No other evidence is introduced, except as to the value of the wood taken; and the question is, whether, upon the above recited state of facts, the claim of the complainant can be sustained.
It is not disputed that the defendant has whatever right or title to the wood, the United States could transfer.
The title to private property may be acquired by the government by capture from a public enemy, by purchase from the true owner, or by a taking under the right of eminent domain.
It is unnecessary now to inquire what are the rights of the government and of the citizen in regard to taking *650 property in territory in the occupation and under the control of the rebel forces, as we are satisfied that the territory where this property is situated, must be held to have been friendly territory at the time of the taking by the- Government, and its inhabitants to have ceased to occupy the relation of enemies to the United States, if they had occupied that relation previous to such occupation. After actual occupation is taken by the national forces, of a district previously held, occupied and controlled by the rebels, and such occupation by the National forces is substantial, complete and permanent, “it draws after it the full measure of protection to persons and property, consistent with a necessary subjection to military government. It does not, indeed, restore peace, or in all respects, former relations; but it replaces rebel by national authority, and recognizes to some extent, the condition and the responsibilities of national citizenship:” The Venice, 2 Wall., 258.
It does not appear by this record, at what time the property in question in this case, was taken possession of by the authorities of the United States. But, as we know, as matter of history, that the United States' forces held firm and permanent occupation of the territory where the property is situated, during the entire later period of the war, we cannot presume that it was taken at an earlier date, when the territory was under rebel control and occupation.
I consider this case, therefore, as one arising within friendly territory, and not as a case of capture from an enemy. It does not appear that the complainant was *651 a rebel, or that the property had been abandoned by him, or used in aid of the rebellion.
The right of the State to impress and take private property for the use of an army in the field, and upon the actual theatre of military operations, depends upon the police power of the nation, and arises from its obligation to protect the national existence, and the lives and property of its citizens.
Like the right to destroy a house, in order to arrest a conflagration, it depends upon the present emergency, and the existence of a necessity which will not wait for due process of law. “The clause prohibiting the taking of private property without compensation, is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property, which is necessary for the orderly existence of all governments:” Sedgw. Const. Law, 505.
Undoubtedly, the government ought, as far as possible, to protect the property of its citizens, and to make compensation to those whose property has been taken and appropriated to the public use. But the making of compensation in cases like the present, is not a condition precedent to the right to take the property, or to the vesting of title thereto in the government.
An army in the field, and conducting military operations, must, of necessity, do many acts which interfere, to a greater or less extent, with private rights of property. Bridges may be burned; railroads torn up; houses destroyed; timber cut down; fortifications erected upon private grounds; and even whole regions of coun *652 try devastated. All this may be done, not only in the enemy’s country, but wherever military operations are being carried on, upon which the emergency arises. Much must necessarily be left, in such cases, to the discretion of the military commander; and if he act not wantonly, but in good faith for the accomplishment of the purposes oí the war, his acts, whether of destruction or of appropriation, are valid and legal.
This police power is one without which nations cannot exist. It must be exercised by and through the military agents of the government. Such agents must, in order to the discharge of their duties, exercise a discretion. And that discretion, unless shown to have been wantonly or in bad faith abused, cannot be revised by the civil courts.
It is true, a military commander has no right to take private property, without a necessity exist for his doing so. But the law, while active military operations are being carried on, makes him the judge of the necessity; and he cannot be held responsible, in a civil tribunal, for mere errors of judgment. 'Were it otherwise — -were a military commander required to be prepared to prove, at any subsequent time, the inevitable necessity for marching an army across a citizen’s farm, or fighting a battle around his house, or consuming his produce, our officers would be in greater danger from their friends, than from their enemies.
These officers are agents of the government, charged with duties in regard to the movements of great bodies of men, and requiring vast amounts of every kind of property; duties, upon the proper discharge of which, depend the lives of thousands of men, and the safety of *653 the country; duties 'which require the exercise of discretion — a discretion which no one but the commander himself cau exercise, and which, in many cases, dejcends upon facts which no one but he knows, or ought to know. A commander, under such circumstances, may, and ought to, take such property as, in his judgment, is necessary, or may possibly contribute to save the lives of his soldiers, and insure the success of his campaigns; and if in good faith he deem the taking necessary, he cannot be required to weigh.nicely in the balances against these great objects, the value of a load of wood, or a bushel of corn-. The responsibility and the discretion rest with the commander; and when he in good faith assumes the one and exercises the other, a civil court .cannot review his decision, but must presume that the discretion was properly exercised.
The necessity which justifies the taking in such a case, is not that overpowering necessity, which admits of no supposable alternative; but, if the vast interests at stake may probably be promoted by the appropriation of the property, it is the right and the duty of the officers, on whom rest the obligation, to omit no useful precaution — to take and appropriate it.
I say nothing in regard to the powers of military commanders in time of peace, or at a.distance from the scene of military operations. No such discretion is confided to them, and their responsibility is' measured by different principles.
Such property, however, can only be taken by the State for the public use. It cannot be taken merely to speculate upon, or to increase the store of wealth and capital of the State.
*654 But, if movable property is thus taken in good faith by the agents of the Government, for the public use, with intent to appropriate it absolutely and permanently to such uses, the title would vest in the State upon such taking; and though it might afterward be found that it was not necessary actually to consume the property in such use, still, the title having once vested in the State, would not revert in the original owner upon the occasion for its use ceasing. The State is not restricted in its right of appropriation of movable property to the mere temporary use of the property, but may, in its discretion, assume the title to the property itself, and sell the proj>erty when no longer required by its necessities. "Whether the taking was for a mere temporary purpose, or with intent to appropriate the entire interest in the property, would be a question of fact; but the retaining of the possession, and treating it as the absolute property of the State, and disposing of it as such, would be evidence of an intention to appropriate the entire interest.
A question arises whether it sufficiently appears from this record, that the wood was cut and taken by the United States authorities for public use, it not being stated in terms that it was cut and taken for the use of the army, or for public use in any other spe-fied manner.
But it is stated in the argument of counsel, that Kent & Co., under the authority of the United States, cut the timber, and sold the same to - the military authorities of the United States, then engaged in war with the Confederate States; and that when the war was *655 ended, the United States transferred tbe wood to the defendant. "We think, upon the whole, that the statement that it was sold to the military authorities of the United States, then at war with the Confederate States, must be held to mean that it was sold for the purposes of the war, and for the use of the military authorities.
We attempt no decision as to what the rights of parties might be in a case where the military agents of the Government, instead of impressing property for the public use, purchase it from a party having no title.
In the present case, though it is stated that Kent & Co. sold the wood to the military authorities, yet it is expressly stated that they cut it under the authority of the United States; and we think it sufficiently appears that though the United States paid Kent & Co. for the wood, as against the complainant, it was taken under the power of impressment.
The decree of the Chancellor must be l’eversed and the bill dismissed.