Mr. Justice Bradley
delivered the opinion of the court:
This case is substantially decided' by the judgment just rendered in the case of Hamilton et al. v. Dillin. It is conceded that the payments of 4 cents per pound on cotton, sought to be recovered in this suit, were made under and in pursuance of the license of the President and the rules and regulations prescribed by the Secretary of the Treasury, whose validity was considered in that case.
The demurrer to the petition was rightly sustained, and the judgment of the Court of Claims must be affirmed.
*78 At tbe same time tbe following opinion was delivered in tbe case referred to, Hamilton ei al. v. Dillin:
Mr. Justice Bradley
delivered tbe opinion of tbe court:
This was an action of assumpsit, brought by tbe plaintiffs in error against the defendant in error to recover a charge or bonus of 4 cents per pound paid by tbe plaintiffs to tbe defendant as surveyor of tbe port of Nashville, Tenn., from August, 1863, to July, 1864, for permits to purchase and ship to the loyal States certain lots of cotton, amounting to over seven millions of pounds. This payment was one of tbe fees or charges required by tbe regulations of tbe Treasury Department to be made as a condition of carrying on tbe said trade between those portions of tbe insurrectionary states within tbe lines of occupation of tbe Union forces and tbe loyal States.
By tbe bill of exceptions it appears to have been admitted on tbe trial that tbe defendant was acting surveyor of customs at Nashville during tbe period in question, and was tbe only person that could grant tbe necessary permits, and that tbe plaintiffs had in their possession, as owners or factors, various lots of cotton, specified in tbe bill of exceptions, which bad been purchased in pursuance of tbe license of tbe President and tbe regulations of tbe Secretary of tbe Treasury in that regard; that they applied to tbe defendant for permits to ship and transport said cotton from Nashville to a loyal State; and that tbe defendant, in obedience to said regulations and instructions, refused to grant such permits except on payment of tbe 4 cents per pound. It is also admitted that tbe regulations were well and publicly known at Nashville, and directed seizure and confiscation of all cotton shipped without such payment and permit, and that tbe plaintiffs made no formal protest against tbe payment of tbe charge, but paid tbe same, and that tbe same was- paid by tbe defendant into the Treasury of tbe United States before tbe commencement of this action. It was also admitted that during said period Nashville was within tbe lines of military occupation of tbe United States.
The plaintiffs then put in evidence tbe Treasury regulations in force at tbe time of tbe shipment of tbe cotton in question. These regulations prohibited the transportation of goods or *79 merchandise'to or from any State or jiart of a State in insurrection, except under permits, certificates, and clearances, as provided therein ,• and the surveyors of the customs at Nashville and other places were designated as the officers to grant such permits. Authority to purchase and transport goods was to be granted only to those who should make the prescribed affidavit and enter into bond to pay all fees required by the regulations; and no permit was to be granted for such purchase and transportation except upon the payment of such fees or the giving of a bond to secure the same. The fees referred to and appended to the regulations, and making part thereof, consisted of various items and charges to be paid, and, among others, “ for each permit to purchase cotton in an insurrectionary district, and to transport the same to a loyal State, per pound, 4 cents.”
This is the fee or charge which was - paid for the permit to purchase and transport the cotton in question, and which is sought to be recovered.
The plaintiffs insisted and requested the court to charge substantially as follows: That this exaction was illegal and void; that it was essentially a tax, and not authorized by any act of Congress, which alone has the power to impose taxes; that, even if it were authorized by law, the law itself was to that extent unconstitutional and void; and that, under the circumstances and state of facts agreed upon by the parties, the payment was involuntary, and no protest was necessary to entitle the plaintiffs to recover back the money thus illegally exacted. The court refused to charge as requested by the plaintiffs, but charged as follows:
First. That the act of July 13, 1861, entitled “ An act further to provide for the collection of duties on imports, and for other purposes,” conferred power upon the Secretary of the Treasury to authorize the exactions mentioned in said plaintiffs’ declaration.
Second. That whether said Act of July 13, 1861, conferred such power or not, the action of the Secretary of the Treasury in imposing, and of the defendant in making, said exactions, was ratified and made valid by the Act of July 2, 1864, entitled “ An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property, *80 and the prevention of frauds in States declared in insurrection.”
Third. That plaintiffs could not maintain action to recover back said exactions, even if they had been illegal, for want of having protested against them at the time of payment.
To this charge exceptions were taken, and we were called upon to decide as to the correctness of these propositions.
There can be no question that the condition requiring the payment of 4 cents per pound for a permit to purchase cotton in and transport it from the insurrectionary States during the late civil war was competent to the war-power of the United States Government to impose. The war was a public one. The Government, in prosecuting it, had at least all the rights which any belligerent power has when prosecuting a public war. That war was itself a suspension of commercial intercourse between the opposing sections of the country. No cotton or other merchandise could be lawfully purchased in the insurrectionary States and transported to the loyal States without the consent of the Government. If such a course of dealing were to be permitted at all, it would necessarily be upon such conditions as the Government chose to prescribe. The war-power vested in the Government implied all this without any specific mention of it in the Constitution.
In England this power to remit the restrictions on commercial intercourse with a hostile nation is exercised by the crown. Lord Stowell says: “By the law and constitution of this country, the sovereign alone has the power of declaring war and peace. He alone, therefore, who has the power of entirely removing a state of war has the power of removing it in part by permitting, where he sees proper, that commercial intercourse which is a partial suspension of the war.” (The Hoop, 1 Eob. Ad., 199.) Bynkershoek says: “ It is in all cases the act of the sovereign.” (Quest. Jur. Pub., B. L, c. 3.) By the Constitution of the United States the power to declare war is confided to Congress. The executive power and the comman of the- military and naval forces are vested in the President. Whether, in the absence of congressional action, the power of permitting partial intercourse with a public enemy may or. may not be exercised by the President alone, who is constitutionally invested with the entire charge of hostile operations, it is not now necessary to decide, although it would seem that little *81 doubt could be raised on tbe subject. In the case of Cross v. Harrison (16 How., 164,190) it was held that the President, as commander-in-chief, had power to form a temporary civil government for California as a conquered country, and to impose duties on imports and tonnage for the support of the Government, and for aiding to sustain the burdens of the Avar, which were held valid until Congress saw fit to supersede them; and an action brought to recover back duties paid under such regulation was adjudged to be not maintainable. The same views were held in Leitensdorfer et ail. v. Webb, (20 How., 176,) in reference to the establishment of a provisional government in New Mexico, in the war with Mexico in 1847, and were reiterated by this court in the case of The Grapeshot, (9 Wall., 129.)
But without pursuing this inquiry, and whatever view may be taken as to the precise boundary between the legislative and executive powers in reference to the question under consideration, there is no doubt that a concurrence of both affords ample foundation for any regulations on the subject.
Our first inquiry, therefore, will be, whether the action of the Executive was authorized, or, if not originally authorized, was confirmed by Congress.
By the Act July 13,1861, (12 Stat. L., p.257, § 5,) the President was authorized, after certain preliminary measures for suppressing the insurrection, to declare by proclamation what States and parts of States were in a state of insurrection against the United States; “ and thereupon,” the act proceeds to say, “all commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States shall cease and be unlawful so long as such condition of hostility shall continue; and all goods, &c., coming from said State or section into the other parts of the United States, and all proceeding to such State or section by land or water, shall, together with the vessel or vehicle, &c., be forfeited to the Cbited States: Provided however, That the President may, in his discretion, license and permit commercial intercourse with any such part of said State or section the inhabitants of which are so declared in a state of insurrection, in such articles and for such time and by such persons as he, in his discretion, may think conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on *82 only in pursuance of rules and regulations prescribed by the Secretary of the Treasury.”
In pursuance of this act the President, on the 16th of August, 1861, issued a proclamation (12 Stat. L., 1262) declaring that certain States (including Tennessee) were in a state of insurrection against the United States, and that all commercial intercourse between them and the citizens of other States was unlawful, and that all goods, &c., coming from said States without the special license and permission of the President, through the Secretary of. the Treasury, or proceeding to any of said States, &c., would be forfeited, &c. This proclamation excepted from its operation, among other things, such parts of the enumerated States as might maintain a loyal adhesion to the Union and Constitution, or might be from time to time occupied and controlled by forces of the United States. A subsequent proclamation, issued April 2, 1863, (13 Stat. L., 731,) abrogated the said exception as embarrassing “ to the due enforcement of said Act July 13, 1861, and the proper regulation of the commercial intercourse authorized by said act f such abrogation, however, not extending to West Yirginia or the ports of New Orleans, Key West, Port Boyal, or Beaufort in South Carolina.
Under and in supposed pursuance of this act and these proclamations, the Iicense'of the President and the trade regulations of the Secretary of the Treasury were made under which the plaintiffs purchased and shipped the cotton in question. These public acts of the executive department must be construed as one system. The license of the President to hold commercial intercourse cannot be separated, in determining this controversy, from the Treasury regulations, which were adopted for the government of that intercourse. There is an evident effort on the part of the plaintiffs to separate them; and it is worthy of passing observation that the actual license of the President was not put in evidence. But a public act of the Government of such importance may receive the judicial notice of the court; and availing ourselves of that right, we find that the regulations referred to as adopted September 11, 1863, are revised regulations expressly approved by the President, and supplementary to previous regulations adopted March 31, 1863, to which the President had attached the license of the same date, under which the entire authority to pursue the trade in this cotton *83 arose. This license, after reciting the act of Congress of July 13,1861, so far as relates to commercial intercourse, proceeds as follows: “And whereas it appears that a partial restoration of such intercourse between the inhabitants of sundry places and sections heretofore declared in insurrection, in pursuance of said act, and the citizens of the rest of the United States will favorably affect the public interests: Now, therefore, I, Abraham Lincoln, President of the United States, exercising the authority and discretion confided to me by the said act of Congress, do hereby license and permit such commercial intercourse between the citizens of loyal States and the inhabitants of such insurrectionary States in the cases and under the restrictions described and expressed in the regulations prescribed by the Secretary of the Treasury, bearing even date with these presents, or in other such regulations as he may hereafter, with my approval, prescribe.”
It is clear, therefore, that the license to trade given by the President was a conditional one, requiring a full compliance with the regulations adopted by the Secretary of the Treasury, between whom and the President, as would be supposed, there was entire harmony and even unity of action.
The question then comes to this: Under the supposed authority of the Act July 13, 1861, the President and Secretary of the Treasury authorized and licensed cotton to be purchased in and transported from insurrectionary districts, on condition that the parties availing themselves of the license should pay to the Government 4 cents per pound and all other fees. If we might offer a conjecture as to the motive for this regulation, it may have been this, namely: that such a bonus would help to counterbalance, in favor of our Government, any benefit which the enemy might derive from a sale of the cotton instead of its destruction. But the actual motive is not material. The Government chose to impose this condition. It supposed it had a right to do so. No one was bound to accept it. No one was compelled to engage in the trade. Not the least compulsion was exercised. The plaintiffs endeavor to put the case as if they were obliged to pay this exaction to savevtheir property. This is not a true view of it. It is admitted that the property was purchased under the license. If so, it was also purchased in view of the regulations to which the license referred. The regulations themselves show that the permit to purchase and *84 the permit to export were correlative to each other; that no one was permitted to purchase who did not enter bond to pay all fees required by the regulations, among which the charge of 4 cents per pound on cotton was expressly inserted. In short, the permit to purchase and export constituted substantially one permit, and that was granted only on the condition of paying the prescribed fees, as before stated. The clearance of particular lots or cargoes required afterwards, when the property was actually shipped, was necessary to show that the stipulated conditions had been complied with, and that the particular articles specified were free for transportation. The whole series of acts constituted, so far as the right to trade and transport was concerned, but one transaction — a conditional permission given on the part of the Government, and the acceptance of and compliance with that condition on the part of the trader.
The position in which the plaintiffs put themselves, therefore, was an entirely voluntary one. They have no right to say, “ It is true we purchased the cotton under a license which required us to paya certain -bonus; but having purchased it, we were entitled to repudiate the condition, although we had no right to make the purchase except by virtue of the license.” Much less have they now a right to say, after having complied with the condition without murmur or objection, that the bonus was extorted from them by compulsion.
Whether, therefore, the President and Secretary of the Treasury did or. did not rightly judge as to their powers under the act, the plaintiffs evidently agreed with them and voluntarily applied for permission to engage in the trade on the conditions imposed, and voluntarily paid the bonus which is now sought to be recovered back. The case does not come within any class of cases on which the plaintiffs rely to take it out of the rule as to voluntary payments. In our judgment, therefore, the defense in this case might have rested on this ground alone.
But we are also of opinion that the conditions imposed were authorized by the Act July 13, 1861. Its language has been already quoted. The material part in reference to the question under discussion is the proviso of section 3, which is as follows:
“ The President may, in his discretion, license and permit commercial intercourse * * * in such articles and for such time and by such persons as he, in his discretion, may think most conducive to the public interest: and such intercourse # * * *85 shall be conducted and carried on only in .pursuance of rules and regulations prescribed by the Secretary of the Treasury.’7
It is contended that the imposition of the bonus of 4 cents per .pound was not a “rule77 or- a u regulation77. within the fair meaning of the act; and it is conceded that in many cases the power to make rules and regulations on a particular subject is a limited power, having respect to mode and form and time and' circumstance, and not to substance. But it must also be conceded that in other cases the power is much more extensive and substantial. Thus, in the Constitution, the several powers “ to regulate commerce,77 “ to establish a uniform rule of naturalization,77 “ to make all needful rules and regulations respecting the territory or other property belonging to the United States,77 are understood to give plenary control over those subjects. The power to regulate commerce has been held to include the power to suspend it, (1 Kent, 432;) and the power to make rules and regulations respecting the territory of the United States has been held to include the power to legislate for and govern such territory and establish governments therein. (4 Wheat., 422; Story on Con., § 1328.) The extensive effect given to those clauses is undoubtedly largely due to the character of the instrument and that of the donee of the power, to wit, the legislature of the United States, to whom the grant of a power means the grant of a branch of sovereignty. It shows, however, that the rule of construction depends, at least in some sort, upon the nature of the subject-matter. In the case before us the power of the Government to open and regulate trade with the enemy was intended to be conferred upon the President and the Secretary of the Treasury. The power of regulation in such a case is to be taken in its broadest sense, and, in our judgment, included the power to impose such conditions as the President and Secretary should see fit.
The statutes relating to the internal revenue, passed July 1, 1862, and March 7,1864, which have been referred to for the purpose of showing that Congress imposed a special tax upon cotton, and therefore could not have intended, by the act of 1861, to sanction the regulations of the Treasury now in question, do not, in our judgment, have that effect. The act of 1862 imposed a tax of half a cent per pound on all cotton, to be paid before its removal from the place of production. The same act and section imposed various taxes on a hundred other *86 articles. The question is, did Congress intend, by the imposition of these taxes, to revoke by implication any power given to the executive department of imposing' such regulations as it might see fit for the carrying on of trade with insurrectionary districts ? We answer, certainly not. The two subjects were entirely distinct. No conflict or repugnancy could arise in relation thereto. When, in March, 1863, the President issued his license to trade in cotton and other articles in the insurrec-tionary districts, under and subject to the conditions contained in the regulations adopted by the Secretary of the Treasury, his action was not inconsistent with or repugnant to the internal-revenue law passed the year before. It had nothing to do with that law or the subject-matter of it. The conditions exacted by him were not imposed in the .exercise of the taxing power, but of the war power of the Government. The exaction itself was not properly a tax, but a bonus required as a condition-precedent for engaging in the trade. Whether, when the condition was fulfilled, the cotton became subject to the internal-revenue law is a question we are not called upon to decide. There was no inconsistency between the regulations and the law any more than there is between a license tax for carrying on a particular trade and the excise imposed on the products of that trade. The Act March 7, 1864, raised the internal-revenue tax on cotton to 2 cents a pound where no duty had already been levied, paid, or collected thereon. Neither does this act present any inconsistency with the regulations in question. If it refers to them at all, (when speaking of duties already paid,) it contains an implied recognition of them. If it does nob refer to them, it does not contravene them.
The position that- Nashville, being within the national lines, was not hostile territory in 1863 and 1864, and therefore not within the prohibition of commercial intercourse contained in the act of 1861, is not tenable. The State of Tennessee was named in the President’s proclamation as one of the States in insurrection; and, as we have seen, the exceptions made in his first proclamation in favor of maintaining commercial intercourse ■with parts of such States remaining loyal, or occupied by the forces of the United States, were abrogated by the proclamation of April 2, 1863, except as to West Yirginia and certain specified ports. There was nothing in this action of the President repugnant to or not in conformity with the act of 1861. *87 “This revocation,” as remarked by this court in the case of The Venice, (2 Wall., 278,) “ merely brought all parts of the insurgent States under the special licensing power of the President, conferred by the act of July 13, 1881.” The act gave the President power, where a State or part of a State remained irreclaimable, to declare that the inhabitants of such State, or any section or part thereof where' such insurrection existed, were in a state of insurrection. This power clearly gave the President a discretion to declare an entire State, where the insurrection was persisted in, or only a hostile district therein, in a state of insurrection. Finding the attempt to discriminate between the different parts of a State (except in peculiar cases) impracticable, he abandoned the attempt, .and declared the ■entire State in a state of insurrection. He clearly has authority so to do, more especially as the insurrection was supported by State organizations and the actual State authorities. Thenceforth the war became a well-defined territorial war, and was in a' .great measure conducted as such. The further provision of the act, that all commercial intercourse with the insurrectionary districts should cease “ so long as such condition of hostility shall continue,” could not be construed as allowing such intercourse to be resumed by individuals at will as fast and as far as our armies succeeded in occupying insurgent territory. The “ condition of hostility ” remained impressed upon the insurrec-tionary districts until it was authoritatively removed by the proclamation of the President at the close of the war.
This view of the meaning of the act of 1861 is corroborated by the Act March 12, 1863, respecting abandoned and captured property.
On the 1st of July, 1862, the President had issued a proclamation declaring what States and parts -of States were in insurrection, with a view to the provisions of the act imposing a land-tax, and made no exception of any fractions of States, except the counties constituting West Virginia. Expressly ■referring to this proclamation, Congress, in the fourth section of the act referred to, enacted “ that all property coming into any of the United States not declared in insurrection as aforesaid, from any of the States declared in insurrection, through or by any other person than any agent duly appointed under the provisions of this act, or under a lawful clearance by the proper officer of the Treasury Department, shall be confiscated.” (Act *88 March 12, 1863,12 Stat. L., p. 820, § 4.) This is a clear recognition on the part of Congress of the President’s demarkation of insurrectionary territory. It is also a recognition of the Treasury regulations as to intercourse with that territory— not, perhaps, of any specific regulations, but of the applicability of such regulations to all portions of insurrectionary territory, whether under occupation of the Union forces or not.
But it is unnecessary to pursue this subject. We have frequently held that the civil war affected the status of the entire territory of the States declared to be in insurrection, except as modified by declaratory acts of Congress or proclamations of the President; and nothing but the apparent earnestness with which the point has been urged would have led to a further discussion of the point. (See Mrs. Alexander'1 s Cotton, 2 Wall., 404; Coppell v. Hall, 7 ib., 542; McKee v. The United States, 8 ib., 163; and numerous other cases.)
We are also of opiniou that the Act July 2,1864, (13 Stat. L., 375,) recognized and confirmed the regulations in question. It is sufficient to quote a portion of the third section to evince the correctness of this conclusion. It enacts as follows: “That all moneys arising from the leasing of abandoned lands,, houses, and tenements, or from sales of captured and abandoned property collected and sold in pursuance of said act or of this act, or from fees collected under the rules and regulations made by the Secretary of the Treasury and approved by the President, dated respectively the 28th of August, 1862, 31st of March and 11th of September, 1863, or under any amendment or modifications thereof, which have been or shall be made by the Secretary of the Treasury and approved by the President, for conducting the commercial intercourse which has been or shall be licensed and permitted by the President with and in States declared in insurrection, shall, after satisfying therefrom all necessary expenses, to be approved by the Secretary of the Treasury, be paid into the Treasury of the United States; and all accounts of moneys received or expended in connection therewith shall be audited by the proper accounting officers of the Treasury.”
Here the regulations in question are referred to by name and date, and the money accruing under their operation (the great bulk of which was derived from the bonus on cotton) was directed to be paid into the Treasury. It is designated by the *89 term “fees,” it is true, but that was tbe designation used in the regulations themselves. It will be observed that the law was prospective, relating to moneys thereafter to be received as well as those already received. This was clearly an implied recognition and ratification of the regulations, so far as any ratification on the part of Congress may have been necessary to their validity.
It is hardly necessary, under the view we have taken of the character of the regulations in question, and of the charge or bonus objected to by the plaintiffs, to discuss the question of the consitutionality of the Act July 13,1861, regarded as authorizing such regulations. As before stated, the power of the Government to impose such conditions upon commercial intercourse with an enemy in time of war, as it sees fit, is undoubted. It is a power which every other government in the world claims and exercises, and which belongs to the Government of the United States as incident to the power to declare war and to carry it on to a successful termination. We regard the regulations in question as nothing more than the exercise of this power. It does not belong to the same category as the power to levy and collect taxes, duties, and excises. It belongs to the war powers of the Government; just as much so as the power to levy military contibutions or to perform any other belligerent act.
We perceive no error in the record, and the judgment of the circuit court must be affirmed.