AHNERT vs. ZAUN.

STATUTE OF LIMITATIONS: *Suspension thereof during the rebellion.*

1. During the late war between the United States and the Confederate States, residents of the one were incapable of suing in the courts of the other; all contracts subsisting between such parties were suspended; and state statutes of limitation ceased to run against such contracts.
2. The disability of residents of New Orleans to sue in the courts of the United States, or of any one of such states, terminated upon the capture and occupation of that city by the forces of the United States, in May, 1862, or at least upon the issue of the president's proclamation of April 2, 1863; and thereupon the statutes of limitation of this state began again to run upon rights of action between residents of this state and residents of New Orleans.

APPEAL from the Circuit Court for *Washington* County.

Ejectment, for an undivided interest in a certain farm in Washington county, being the same land the title to which was involved in the case of *Wiesner v. Zaun*, 39 Wis., 188.

In November, 1847, Rosina Ahnert died seized of said land in fee, her husband, Johann Gottlieb Ahnert, and six minor children, of whom plaintiff was one, surviving her. Rosina Ahnert having died, and four of plaintiff's brothers having also died unmarried and intestate, prior to this action, plaintiff claims title by descent to an undivided five-twelfths of said land. Defendant claims under a deed purporting to convey the whole title, executed in 1851 by Johann Gottlieb Ahnert to one Philip Andreas Zaun, who, the answer alleges, conveyed to defendant in October, 1861; and sets up in bar of plaintiff's action, an adverse possession in himself and said Philip, his grantor, for a period of more than ten years.

The proofs disclosed a slight variance from the allegations of the answer; it appearing that in July, 1851, Philip Andreas Zaun had conveyed to one William Pors, who, on the following day, reconveyed to the wife of said Philip, and the latter joined with her husband in a conveyance to defendant. But

the principal question arose on the defense of adverse possession.

The jury found specially that Philip Andreas Zaun entered immediately into possession of the premises, after the conveyance to himself, claiming title under such conveyance, and with his wife continued to reside thereon until they conveyed to defendant, since which time the latter had been in possession; that Johann Gottlieb Ahnert died in March, 1857, and that plaintiff and his brothers were, during the war of the rebellion, residents of the city of New Orleans. This action was commenced in November, 1873.

Upon these and the other facts found, the court rendered judgment that plaintiff recover an undivided two-fifths of the premises claimed. From this judgment the defendant appealed.

The brief for the appellant was signed by *Jenkins, Elliott & Winkler*, and that for the respondent by *E. P. Smith* and *Frisby & Weil;* and the cause was argued orally by *F. C. Winkler* for the appellant, and by *L. F. Frisby* and *E. P. Smith* for the respondent.

On the question of variance, appellant's counsel argued, that the character of the entry determined that of the possession, and that parties in possession under a recorded deed were presumed to hold and claim under that deed; that the character of the possession was not changed by the conveyance to Mrs. Zaun; that defendant was not obliged to set out the chain of title under which he claimed, and that he had stated it sufficiently; but if there was a variance in that respect, it was immaterial and should be disregarded. *Quinn v. Quinn*, 27 Wis., 168; *Sydnor v. Palmer*, 29 id., 226; *Stevens v. Brooks*, 32 id., 326; Tay. Stats., 1445, §§ 35, 36, and 1447, § 44. 2. Upon the question of adverse possession, counsel contended that the enforced nonintercourse was the foundation of all the disabilities of war, and the period of the suspension of the statute of limitations must be measured by the

duration of such nonintercourse (*Adger v. Alston*, 15 Wall., 555; *Batesville Institute v. Kauffman*, 18 id., 151; *Ross v. Jones*, 22 id., 576; *Brown v. Hiatt*, 1 Dill., 372; 15 Wall., 177); that the public proclamations of the president must be consulted to determine when the war began and when it closed at different places (2 Black, 287; *The Protector*, 12 Wall., 700); that the first proclamation bearing upon the question was that of August 16, 1861 (12 U. S. Stats., 1262), issued in pursuance of the act of congress of July 13, 1861, which declared the inhabitants of certain states, including Louisiana, in a state of insurrection, excepting residents of those parts of such states which might be "from time to time occupied and controlled by forces of the United States;" that the proclamation of April 19 was provisional merely, and was superseded by the later one; that intercourse was not prohibited between the inhabitants of loyal states and those persons coming within the exception, nor was the running of the statute of limitations suspended as to rights of action between them; that the occupation of the city of New Orleans by the federal forces became complete on the 6th of May, 1862, from which time the prohibition as to intercourse with her citizens ceased; that the cases in which such citizens had been recognized as claimants in admiralty sustained this doctrine (*The Venice*, 2 Wall., 258; *U. S. v. 100 Bbls. Cement*, 3 Am. Law Reg., N. S., 735–8; *The Ouachita Cotton*, 6 Wall., 521; *Chappelle v. Olney*, 1 Sawy., 401); that if, as held in *U. S. v. 129 Packages*, 2 Am. Law Reg., N. S., 419, 431–3, the public proclamations were alone to be consulted to determine the fact of occupation, the very latest date to which the period of disability could be extended was April 2, 1863, as on that day the president revised his proclamation of August 16, 1861, declaring what states and territory were in rebellion, expressly excepting the port of New Orleans; but that he had previously, in his proclamation of January 1, 1863, declared the same exception, and by proclamation of May 12, 1862, had opened

that port to commercial intercourse with foreign countries and the loyal states, except as to contraband of war. Counsel further cited upon this point, 11 Wall., 244; *University v. Finch*, 18 id., 106; *Braun v. Sauerwein*, 10 id., 218; *Sherman v. Bush*, 8 Ch. Leg. News, 362; distinguishing *Hamilton v. Dillin*, 21 Wall., 73, in which Nashville, not being expressly excepted in the proclamation of April 2, 1863, was held still within the prohibition, and contending that the case of *Perkins v. Rogers*, 35 Ind., 124, was contrary to the authorities, and showed a gross misconception of those quoted in the opinion.

For the respondent it was argued, 1. That the objection as to limitation must be raised by proper plea or answer, or it will be disregarded. Tay. Stats., 1622, § 7; *Lockwood v. Wildman*, 13 Ohio, 430; *Howell v. Howell*, 15 Wis., 60; *Chappelle v. Olney*, U. S. Ct. Ct., Oregon, Am. Law Times, Dec., 1870. The plea is not favored, nor allowed, generally, to be amended; and the defendant, having answered specifically, must be limited to his answer. *Orton v. Noonan*, 25 Wis., 672; *Sydnor v. Palmer*, 29 id., 252; Steph. Pl., 264, 425. An adverse possession in Philip Andreas Zaun, as alleged in the answer, commencing with the date of the conveyance to himself, and terminating October 21, 1861, when he and his wife conveyed to defendant, is wholly unsustained by the proofs. Such possession did not commence until the death of the tenant by the curtesy (Angell on Lim., §§ 369, 371, 372; *Sands v. Hughes*, 53 N. Y., 294); it was not continuous, as the proofs showed an alienation without any possession taken by the grantee; and the possession of Mrs. Zaun, even if it had been averred, was not adverse, not being accompanied by any open and notorious acts of ownership. *Bates v. Norcross*, 14 Pick., 224; Angell, §§ 390, 391, 400, 409; *Barney v. Seeley*, 38 Wis., 381; *Sydnor v. Palmer, supra;* 2 Smith's L. C., 492. Moreover, the deed to her, being a simple quitclaim, does not purport to convey the whole title, and no adverse

possession can be founded thereon. *Jackson v. Smith,* 13 Johns., 412; *Prescott v. Nevers,* 4 Mason, 326; *Stevens v. Brooks,* 24 Wis., 324; *Town v. Needham,* 3 Paige, 549; *May v. Le Claire,* 11 Wall., 232; *Marshall v. Roberts,* 18 Minn., 406. 2. That, as between citizens of belligerent countries, all claims and remedies are alike suspended while the war exists; statutes of limitation cease to run, and revive only upon the full restoration of peace. *Perkins v. Rogers,* 35 Ind., 141; 1 Kent's Com., 68; *Griswold v. Waddington,* 15 Johns., 57; *Brown v. Hiatts,* 15 Wall., 182; *The Protector,* 12 id., 700. The rebellion may be considered as commencing on the 19th of April, 1861, the date of the president's proclamation of intended blockade, as to which see 14 Stats. at Large, 811; 12 Wall., 702; *Prize Cases,* 2 Black, 635; or on the 16th of August, 1861, the date of the proclamation declaring certain territory in insurrection (12 Stats. at Large, 1262; *McStea v. Matthews,* 50 N. Y., 166); but from the latter date, at latest, the citizens of Louisiana must be regarded as enemies, without respect to personal sentiments or opinions. 2 Black, 635; 1 Kent's Com., 75, 76. The proclamation itself is evidence of this, and the court takes judicial cognizance thereof (1 Greenl. Ev., § 6; *Peyroux v. Howard,* 7 Pet., 324; *The Appollon,* 9 Wheat., 374); as also that the citizens of Wisconsin were loyal. 35 Ind., 142. Peace was not legally restored until the proclamation of August 20, 1866 (13 Stats. at Large, 814; *United States v. Anderson,* 9 Wall., 56; 35 Ind., 162); the exception in the act of congress of July 13, 1861, upon which the proclamation of August 16 was founded, relative to those sections which should, from time to time, be occupied by the federal forces, could apply only to a limited commercial intercourse, for which purpose the president was empowered to grant licenses; all intercourse, except as thus authorized, continued still within the prohibition. 21 Wall., 89; 12 Stats. at Large, 257; 35 Ind., 150; *Brown v. Hiatts, supra;* Am. Law Times, 1871. Had the state of war ceased, no restrictions

could have been imposed. Const. U. S., art. IV, sec. 1. A permission for commercial intercourse is but a partial suspension of the war. *Hamilton v. Dillin*, 21 Wall., 78. The occupation of New Orleans was one resulting from conquest, was so regarded by her citizens at the time, and could not have restored the latter to all the constitutional privileges and immunities of the citizens of the several states. *The Venice*, 2 Wall., 261; *McLemore v. Louisiana State Bank* (U. S. Sup. Ct., Oct. 18, 1874), 8 Ch. Leg. News, 57; *The Circassian*, 2 Wall., 135; *Thorington v. Smith*, 8 id., 12; *United States v. Rice*, 4 Wheat., 246; *Fleming v. Page*, 9 How., 603; *New Orleans v. Steamship Co.*, 20 Wall., 387. There was not, at any time during such occupation, unrestricted commercial intercourse between such citizens and those of loyal states, but such as existed was permissive only, and subject at any time to be rescinded and withdrawn; and the authorities cited establish that it is not the period of nonintercourse which marks the limits of disability, but the period of a state of war; that until a full restoration of peace, the citizens of the insurgent territory were shut out of our courts of justice, and therefore, as to them, the statute ceased to run.

COLE, J. The important question in this case is, whether the plaintiff was prevented by the existence of civil war from bringing his action in the courts of this state before the statute of limitations had run upon it. It is a fact found by the jury, that the plaintiff and his brother Ernst were residents of the city of New Orleans during the late war of the rebellion, and that they continued to reside in that city during the war. And the learned counsel contends that in consequence of the residence of the plaintiff in that city, and his disability to sue, there should be deducted from the computation the period covered by the war up to August 20, 1866, when the rebellion was declared to be completely suppressed and peace restored by the proclamation of the president of that date. On the

other hand, the counsel for the defendant insists that the plaintiff can claim no suspension of the statute of limitations beyond, at the utmost, the 2d day of April, 1863; and that, strictly, nonintercourse between New Orleans and the loyal states terminated on the 6th day of May, 1862, on the capture and occupation of the city by the United States army, at which time adverse possession under color of title began again to run against the plaintiff. The consequences of the war upon the plaintiff's rights must be ascertained and determined, if possible, from the adjudications of the supreme court of the United States, which we deem controlling upon the subject.

Under the authorities, there is no room for doubt or argument as to the legal consequences which result from a state of war upon all contracts and existing remedies, so far as the citizens of the belligerent countries are concerned. Mr. Justice NELSON, in the *Prize Cases*, states the doctrine as follows: "The people of the two countries became immediately the enemies of each other — all intercourse commercial or otherwise between them unlawful — all contracts existing at the commencement of the war suspended, and all made during its existence, utterly void." And as touching the right of a citizen of one belligerent to maintain a suit in the courts of the other, Mr. Justice CLIFFORD, in *Hanger v. Abbott*, 6 Wall., 532–539, remarks: "Total inability on the part of an enemy creditor to sustain any contract in the tribunals of the other belligerent exists during the war; but the restoration of peace removes the disability, and opens the doors of the courts. Absolute suspension of the right, and prohibition to exercise it, exists during war by the law of nations; and if so, then it is clear that peace cannot bring with it the remedy, if the war is of much duration, unless it also be held that the operation of the statute of limitations is also suspended during the period the creditor is prohibited by the existence of the war and the law of nations from enforcing his claim." The court has likewise repeatedly held that the statute of limitations of

the several states did not run against the right of action of parties during the continuance of the civil war. *The Protector*, 9 Wall., 687; *Same Case*, 12 id., 700; *Levy v. Stewart*, 11 id., 244; *United States v. Wiley*, id., 508; *Brown v. Hiatts*, 15 id., 177; *Batesville Institute v. Kauffman*, 18 id., 152; *Ross v. Jones*, 22 id., 576.

And the court says that our civil war " was accompanied by the general incidents of a war between independent nations; that the inhabitants of the confederate states on the one hand, and the loyal states on the other, became thereby reciprocally enemies to each other, and were liable to be so treated without reference to their individual dispositions or opinions; that during its continuance all commercial intercourse and correspondence between them was interdicted by principles of public law, as well as by express enactments of congress; that all contracts previously made between them were suspended; and that the courts of each belligerent were closed against the other." *Brown v. Hiatts, supra.*

It is not denied that this was the relation which existed between the citizens of the loyal and disloyal states — that the war affected the condition of the entire territory of the states declared to be in a state of insurrection, except as modified by the laws of congress or the proclamations of the president. Congress, however, authorized the president by proclamation to declare that the inhabitants of a state, or any section or part thereof, where insurrection existed, were in a state of insurrection against the United States, and thereupon all commercial intercourse between the same and the citizens thereof and the citizens of the rest of the United States should cease and be unlawful so long as such condition of hostility should continue. Section 5 of act of July 13, 1861, 12 U. S. Stats., 257. In August, 1861, the president issued a proclamation declaring the inhabitants of certain states named to be in a state of insurrection against the United States, excepting such parts of those states as might maintain a legal adhesion to the

Union and the constitution, or might be from time to time occupied and controlled by forces of the United States engaged in the dispersion of the insurgents. 12 U. S. Stats., 1262. This proclamation was in force when the forces of the United States captured and occupied the city of New Orleans on the 6th of May, 1862. On the 2d of April, 1863, the president issued a new proclamation revising his former one of August, 1861, revoking certain exceptions therein contained; declaring the inhabitants of the states named to be in a state of insurrection; but excepting from the operation of the proclamation certain designated ports, among which was the port of New Orleans. 13 U. S. Stats., 730.

The supreme court, in cases which have come before it, has had occasion to consider and declare the legal consequences of these various acts of the political department of the government. In the case of the schooner *Venice*, 2 Wall., 258, which, with a cargo of cotton, was captured in Lake Pontchartrain, Louisiana, by the United States ship-of-war Calhoun, on the 15th of May, 1862, was taken to Key West, and libeled as a prize of war in the district court, but was restored with her cargo to the claimant, Cook, who was a native British subject and had resided and been engaged in business in New Orleans, without being naturalized as a citizen of the United States, for ten years previous to the capture, the court held that "the military occupation of the city of New Orleans by the forces of the United States, after the dispossession of the rebels from that immediate region in May, 1862, may be considered as having been substantially complete from the publication of General Butler's proclamation of the 6th of May; and all the rights and obligations resulting from such occupation, or from the terms of the proclamation, existed from the date of that publication." The chief justice, in the course of his opinion, after referring to the capture of the schooner, the occupation of the city, the proclamation of General Butler, the act of congress of July 13, 1861, and the pro-

clamation of the president issued in pursuance of that act, says: "This legislative and executive action related, indeed, mainly to trade and intercourse between the inhabitants of loyal and the inhabitants of insurgent parts of the country; but, by excepting districts occupied and controlled by national troops from the general prohibition of trade, it indicated the policy of the government not to regard such districts as in actual insurrection, or their inhabitants as subject, in most respects, to treatment as enemies. Military occupation and control, to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient; but substantial, complete and permanent. Being such, it draws after it the full measure of protection to persons and property consistent with a necessary subjection to military government. It does not, indeed, restore peace or, in all respects, former relations; but it replaces rebel by national authority, and recognizes, to some extent, the conditions and the responsibilities of national citizenship.

"The regulations of trade made under the act of 1861, were framed in accordance with this policy. As far as possible, the people of such parts of the insurgent states as came under national occupation and control, were treated as if their relations to the national government had never been interrupted. * * Vessels and their cargoes belonging to citizens of New Orleans, or neutrals residing there, and not affected by any attempts to run the blockade, or by any act of hostility against the United States after publication of the proclamation, must be regarded as protected by its terms."

The decree of the district court restoring the property to the owner was affirmed. It is evident that here was a full and complete recognition of the ability of a resident of the city of New Orleans to come into a court of admiralty, to assert and maintain his right to a vessel and cargo, which, the chief justice says, "though undoubtedly enemy's property at the time she was anchored in Lake Pontchartrain, cannot be

regarded as remaining such after the 6th of May." The ground upon which the decision in the Venice rests, is very clearly stated by Mr. Justice SWAYNE in the *Ouachita Cotton Case* (6 Wallace, 521–531), as follows: " The subjugation of New Orleans and the restoration of the national authority there are regarded as having become complete on the 6th of May, 1862. From that time its citizens were clothed with the same rights of property, and were subject to the same inhibitions and disabilities as to commercial intercourse with the territory declared to be in insurrection, as the inhabitants of the loyal states. Such is the result of the application of well settled principles of public law. The proclamation of the 2d of April, 1863, recognized but did not change the existing condition of things. It was the same afterwards as before. The effect of the proclamation was cumulative."

In that case the cotton was seized in April, 1864, by the naval forces of the United States, on a plantation up the Ouachita river, in a part of Louisana then, as from the origin of the rebellion, subject to the power of the Confederate government. The cotton was claimed by citizens of Ohio and residents or corporations of New Orleans, who had purchased it of the rebel government after the 6th of May, 1862. The court held that " the restoration of the national authority at that date " fixed " upon the purchasers the same disabilities as to commercial intercourse with the territory declared to be in insurrection as it had previously fixed upon the inhabitants of the loyal states." The purchases, therefore, were all declared illegal and void, for the reason and upon the ground that all commercial intercourse between the inhabitants of insurgent territory and inhabitants of the other states, except under the license of the president and according to the regulations prescribed by the secretary of the treasury, was entirely prohibited. The plain doctrine of this case is, that the citizens of New Orleans were subject to the same disabilities and sustained the same relations in respect to the inhabitants

of the insurrectionary territory, as existed between those inhabitants and the citizens of other portions of the Union. In other words, the " condition of hostility," so far as the inhabitants of that city were concerned, had been removed by the operation of the president's proclamation and its capture and occupation by the United States forces. And it seems to us the logical result of all these adjudications is, that the plaintiff was under no disability to bring an action in the courts of this state, in consequence of the war, after May, 1862, or certainly after April, 1863. No other inference can be fairly drawn from them, and they are conclusive upon the question before us.

The counsel for the plaintiff made a point that the defense of adverse possession was not sufficiently set up in the answer, or that there was a variance between the allegations . of the answer and proof. We have considered these objections, but fail to see any force in them. If there was a variance, it was quite immaterial. These remarks, together with what is said in *Wiesner v. Zaun,* 39 Wis., 188, dispose of all questions we deem it necessary to notice.

*By the Court.* — The judgment of the circuit court is reversed, and a new trial ordered.